[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-12676

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 26, 2003
THOMAS K. KAHN
CLERK

IN RE: GLENN HOLLADAY,

                              Petitioner.

_____

Application for Leave to File a Second or Successive
Habeas Corpus Petition, 28 U.S.C. § 2244(b)

_____

(May 26, 2003)

Before TJOFLAT, ANDERSON and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Petitioner Glenn Holladay is a state prisoner scheduled to be executed at 6:01

p.m. on May 29, 2003. He has filed this eleventh hour application for leave to file a

second federal habeas corpus petition based on the United States Supreme Court's

decision in Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335

(2002) and for a stay of execution. He alleges that he is mentally retarded, and that

under Atkins his execution is flatly forbidden under the Eighth Amendment to the

United States Constitution. The State of Alabama opposes Holladay's motion, arguing that he is not mentally retarded and that in any event this claim was procedurally defaulted. The State also contends that by waiting nearly a year following the Atkins decision to file this motion, petitioner's application constitutes an abuse of the writ.

Holladay was convicted on June 26, 1987 of the murders of Larry Thomas, Jr., Rebecca Ledbetter Holladay (his ex-wife) and David Robinson, his ex-wife's then-boyfriend. The following day, the jury unanimously recommended that he be sentenced to death, and on July 27, 1987 the trial court formally imposed a death sentence on petitioner. Although in arriving at this decision the court found no statutory mitigating circumstances, it did find four non-statutory mitigating circumstances: Holladay's deprived childhood, his neglect and abuse as a child, his slight mental retardation and his lack of formal education. Nonetheless, the trial court concluded that these mitigating circumstances were outweighed by the two statutory aggravating circumstances in the case, viz., that the capital offense was committed while petitioner was under a sentence of imprisonment and that Holladay previously had been convicted of felonies involving the threat or use of personal violence.

On direct appeal, petitioner's conviction and sentence were affirmed by the Alabama Court of Criminal appeals and the Alabama Supreme Court. See Holladay

v. State, 549 So. 2d 122 (Ala. Crim. App. 1988), aff'd sub nom. Ex parte Holladay, 549 So. 2d 135 (Ala. 1989). Subsequently, the United States Supreme Court denied Holladay's petitions for a writ of certiorari, see Holladay v. Alabama, 493 U.S. 1012, 110 S. Ct. 575, 107 L. Ed. 2d 569 (1989), and for rehearing, see Holladay v. Alabama, 493 U.S. 1095, 110 S. Ct. 1173, 107 L. Ed. 2d 1075 (1990).

Holladay subsequently filed a petition for post-conviction relief under Temporary Rule 20 of the Alabama Rules of Criminal Procedure (now Ala. R. Crim. P. 32.2). Although the Rule 20 court found that most of his claims were procedurally barred as having not been raised at trial or on direct appeal, it analyzed Holladay's claim of ineffective assistance of counsel, ultimately concluding that counsel's performance had been neither objectively deficient nor prejudicial to petitioner. See Holladay v. State, Cir. Ct. of Etowah County, 1991 (No. CC-86-1057.60ST, Sept. 24, 1991) at 47-48. The Rule 20 court's denial of post-conviction relief was affirmed by the Alabama Court of Criminal Appeals, see Holladay v. State, 629 So. 2d 673 (Ala. Crim. App. 1992) and the Alabama Supreme Court denied certiorari review, see id. The United States Supreme Court also denied Holladay's petition for a writ of certiorari. See 510 U.S. 1171, 114 S. Ct. 1208, 127 L. Ed. 2d 555 (1994).

Holladay then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Northern District of Alabama, with

his primary claim sounding in ineffective assistance of counsel. On May 29, 1998, the magistrate judge issued a Report and Recommendation that the petition be denied, and on July 22, 1998, after considering Holladay's objections to the report and recommendation, the district court denied the petition. We affirmed this denial, see Holladay v. Haley, 209 F.3d 1243 (11th Cir. 2000), denied rehearing and rehearing en banc, see Holladay v. Haley, 232 F.3d 217 (11th Cir. 2000), and the United States Supreme Court again denied certiorari, see Holladay v. Haley, 531 U.S. 1017, 121 S. Ct. 578, 148 L. Ed. 2d 495 (2000). Subsequently, in response to a request from the State, on March 24, 2003 the Alabama Supreme Court scheduled Holladay's execution for May 29, 2003.

Petitioner now moves for leave to file a second petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2244 based on the Supreme Court's recent decision in Atkins.

Our consideration of a request to file second or successive habeas petitions is governed by the statutory requirements found in: 1) 28 U.S.C. § 2244(b), which provides in pertinent part that "[a] claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless . . . the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme

4

Court, that was previously unavailable . . .," 28 U.S.C. § 2244(b)(2)(A); and 2) § 2244(b)(3)(C), which says that "[t]he court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection."

In this case, there is no question that the rule recently announced by the Supreme Court in Atkins -- that the execution of mentally retarded persons constitutes "cruel and unusual punishment" in violation of the Eighth Amendment, see 536 U.S. at 321, 122 S. Ct. 2252 -- is a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court that was previously unavailable. In particular, whereas prior to Atkins there was no prohibition against executing the mentally retarded, the Supreme Court plainly announced in that case that "pursuant to our narrowing jurisprudence, which seeks to ensure that only the most deserving of execution are put to death, an exclusion for the mentally retarded is appropriate." 536 U.S. at 319, 122 S. Ct. at 2251.

In Tyler v. Cain, Justice O'Connor explained in a concurring opinion that a new rule of constitutional law is made retroactive not only through an express pronouncement of retroactivity, but also "through multiple holdings that logically dictate the retroactivity of the new rule." 533 U.S. 656, 668, 121 S. Ct. 2478, 2485, 150 L. Ed. 2d 632 (2001). Specifically, she said, "if we hold in Case One that a

5

particular type of rule applies retroactively to cases on collateral review and hold in Case Two that a given rule is of that particular type, then it necessarily follows that the given rule applies retroactively to cases on collateral review. In such circumstances, we can be said to have 'made' the given rule retroactive to cases on collateral review." Id. at 668-69, 121 S. Ct. at 2485-86.

The Supreme Court's cases concerning the constitutionality of executing the mentally retarded provide a paradigmatic example of the "retroactivity by logical necessity" described by Justice O'Connor. Framed in the simplest terms, in Penry v. Lynaugh the Court unambiguously observed that "if we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons . . . regardless of the procedures followed, such a rule would fall under the first exception to the general rule of nonretroactivity and would be applicable to defendants on collateral review." 492 U.S. 302, 330, 109 S. Ct. 2934, 2953, 106 L. Ed. 2d 256 (1989). Although the Court ultimately rejected such a rule in Penry, see id. at 340, 109 S. Ct. at 2958, in Atkins the Court reversed course and announced that "the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." 536 U.S. at 321, 122 S. Ct. at 2252 (quoting Ford v. Wainwright, 477 U.S. 399, 405, 106 S. Ct. 2595, 2599, 91 L. Ed. 2d 335 (1986)).

6

At this point, there is no question that the new constitutional rule abstractly described in <u>Penry</u> and formally articulated in <u>Atkins</u> is retroactively applicable to cases on collateral review. <u>See</u> <u>Walker v. True</u>, 4th Cir., 2003 (No. 02-22, May 6, 2003) ("[T]he Court in <u>Atkins</u> announced a new rule of constitutional law that applies retroactively to cases on collateral review."); <u>In re Morris</u>, __ F.3d __ (5th Cir. 2003) (noting that under <u>Penry</u> and <u>Atkins</u> the <u>Atkins</u> rule is retroactively applicable); <u>Bell v. Cockrell</u>, 310 F.3d 330, 332 (5th Cir. 2002) (agreeing "that <u>Atkins</u> constitutes an exception to the non-retroactivity rule of <u>Teague v. Lane</u>, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989), and therefore applies retroactively"); <u>Hill v. Anderson</u>, 300 F.3d 679, 681 (6th Cir. 2002) ("In <u>Atkins</u>, the Supreme Court held at the end of its term that executing a mentally retarded individual violates the Eighth Amendment's ban on cruel and unusual punishments. This holding applies retroactively . . . .") (citation omitted).

Importantly, however, our finding that the requirements expressly set forth in 28 U.S.C. § 2244(b)(2)(A) are satisfied in this case does not terminate our analysis. Indeed, these requirements merely represent the minimum showing that Holladay must make if we are to permit him to file a second or successive petition for a writ of habeas corpus. <u>See</u> § 2244(b)(3)(C) ("The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes

7

a prima facie showing that the application satisfies the requirements of this subsection."). In this case, we find it manifestly obvious that in order to make a prima facie showing that he is entitled to file a second or successive petition based on Supreme Court's decision in Atkins, Holladay also must demonstrate that there is a reasonable likelihood that he is in fact mentally retarded.[1] Cf. In re Morris, __ F.3d __ (5th Cir. 2003) (granting a motion to file a "second or successive" habeas application only upon a showing that "applicant should be categorized as 'mentally retarded'").

The requisite showing was articulated by the Seventh Circuit as being "a sufficient showing of possible merit to warrant a fuller exploration by the district court." Bennett v. United States, 119 F.3d 468, 469 (7th Cir. 1997). The Bennett court elaborated on the substance of this standard, saying that "[i]f in light of the documents submitted with the application it appears reasonably likely that the application satisfies the stringent requirements for the filing of a second or successive petition, we shall grant the application." Id. at 470. The Fifth Circuit, among others has expressly adopted the Bennett standard. See Reyes-Requena v. United States, 243 F.3d 893, 899 (5th Cir. 2001) ("'By "prima facie showing" we understand . . .

---

[1] Were it otherwise, then literally any prisoner under a death sentence could bring an Atkins claim in a second or successive petition regardless of his or her intelligence. No rational argument can possibly be made that this result is appropriate under § 2244(b).

simply a sufficient showing of possible merit to warrant a fuller exploration by the district court.'  Therefore, if from the application and its supporting documents, 'it appears reasonably likely that the application satisfies the stringent requirements for the filing of a second or successive petition,' the application shall be granted." (quoting Bennett, 119 F.3d 469-70)); see also Bell v. United States, 296 F.3d 127, 128 (2d Cir. 2002) ("A prima facie showing is not a particularly high standard. An application need only show sufficient likelihood of satisfying the strict standards of § 2255[2] to 'warrant a fuller exploration by the district court.'" (quoting Bennett, 119 F.3d at 469); Thompson v. Calderon, 151 F.3d 918, 925 (9th Cir. 1998) (same); Rodriguez v. Superintendent, 139 F.3d 270, 273 (1st Cir. 1998) (same), overruled on other grounds by Bousley v. United States, 523 U.S. 614, 622-23, 118 S. Ct. 1604, 1611, 140 L. Ed. 2d 828 (1998).   We adopt this standard as well and, given the Supreme Court's recent flat prohibition against executing the mentally retarded, hold that if petitioner's proofs, when measured against the entire record in this case, establish a reasonable likelihood that he is in fact mentally retarded, then we are required to grant him leave to file a second or successive habeas petition on the basis of Atkins.

---

[2] "The same standard applies to both state and federal successive habeas applications." Bell, 269 F.3d at 128 (citing Bennett, 119 F.3d at 469).

In this case, the record contains substantial conflicting evidence regarding Holladay's intellectual capacity. Indeed, both petitioner's motion and the State's response to that motion devote much attention to the question of whether petitioner is or is not mentally retarded. On the one hand, as Holladay notes, he has taken ten IQ tests since 1958, and, in chronological order, he has scored as follows: **49** (1958); **56** (1958); **54** (1963); **66** (1968); **73** (1969); **69** (1978); **68** (1979); **72** (1979); **71** (1987); **65** (1991).[3] The mean of these ten scores is 64. During his school years

_____

[3]"'Mild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70." Atkins, 536 U.S. at 308 n.3 (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 42-43 (4th ed. 2000)); see also Brown v. Crosby, 249 F. Supp. 2d 1285, 1295 (S.D. Fla. 2003) ("An IQ between 70 and 75 or lower 'is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.'" (quoting Atkins, 536 U.S. at 309 n.5, 122 S. Ct. at 2245 n. 5)).

Notably, however, a diagnosis of mental retardation requires more than a low IQ score, as an inability to function adaptively in society also is necessary. As the Supreme Court explained:

The American Association of Mental Retardation (AAMR) defines mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992).

The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years

(which lasted until the sixth grade), Holladay frequently was referred to as slightly mentally retarded or a "slow learner."  In 1963, a report prepared by the Alabama Department of Human Resources denoted him as "barely educable with a Wechsler IQ of 54."

Moreover and quite significantly, at the sentencing phase of Holladay's trial the court instructed the jury that it could consider petitioner's mental retardation as a mitigating circumstance, and his counsel submitted a significant amount of evidence of his mental retardation for the jury's consideration.  Subsequently, the trial court squarely said in its judgment of conviction:  "The Court further finds that the

---

(Criterion C).  Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000).

Atkins, 536 U.S. at 308 n.3, 122 S. Ct. at 2245 n.3.

The Supreme Court in Atkins left it to the several state legislatures to formulate precise standards for determining whether an individual is retarded.  See 536 U.S. at 317, 122 S.Ct. at 2250 ("To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation.  Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.  As was our approach in Ford v. Wainwright, with regard to insanity, 'we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences.'" (quoting 477 U.S. at 405, 416-17, 106 S. Ct. at 2605)).  However, to date the Alabama legislature has not enacted such a standard.

11

Defendant is slightly mentally retarded . . . ."  In this context, we note that Atkins himself was described as "mildly mentally retarded." Atkins, 536 U.S. at 308, 122 S. Ct. at 2245 (citation and internal punctuation omitted).  Furthermore, as we observed in evaluating Holladay's first habeas petition, "[e]ven the prosecutor, in his closing, acknowledged that Holladay was slightly mentally retarded." Holladay v. Haley, 209 F.3d 1243, 1249 (11th Cir. 2000).

On the other hand, the State correctly notes that mental retardation is not a product of IQ scores alone and that an individual's ability to adaptively function in society is a vital element of a retardation diagnosis.  As the State further observes, despite his low IQ scores petitioner has been found by numerous experts to be highly adaptive and therefore not retarded.  Notably, this issue played an important role in the Alabama courts' analysis of his claim of ineffective assistance of counsel, which he advanced in his post-conviction proceeding under Ala. R. Crim. P. 20.  Holladay claimed that his trial counsel was ineffective for failing to present evidence of his mental retardation at the sentencing phase of his trial, and the Rule 20 court rejected this assertion on two distinct grounds.

First, the court accurately noted that trial counsel did present such evidence. Second, and more significantly from our perspective, it engaged in a searching analysis of the testimony of one prosecution expert on mental retardation (Dr. Joe

Dixon), who opined that petitioner was not mentally retarded but rather fell into "the borderline range of intelligence," and two defense experts on this subject (Drs. Brad Fisher and Michael Norko) who testified contrarily that Holladay was in fact mentally retarded. The Rule 20 court ultimately "credit[ed] the testimony of Dr. Dixon and . . . not . . . the testimony of Dr. Fisher and Dr. Norko." In explaining this determination, the court noted what it perceived to be several flaws in the methodologies employed and conclusions reached by Fisher and Norko. It also observed that Dixon's testimony was consistent with the opinions offered by "at least seven competent psychologists and psychiatrists," all of whom had examined Holladay.

The Alabama Court of Criminal Appeals upheld the Rule 20 court's credibility determinations and legal conclusions, saying that "[a]n examination of the record substantiates the trial court's findings and establishes that appellant's trial counsel conducted a thorough investigation, discovered certain mitigating circumstances, and presented this evidence to the court and to the jury." Holladay, 629 So. 2d at 683 (emphasis added).

In determining whether petitioner has demonstrated that he should be granted leave to file a second habeas petition to address for the first time whether his execution would violate the Eighth Amendment, we are required to consider the

13

evidence of his intellectual capacity in its totality. When we do so in this case, we are compelled to say that there is a "reasonable likelihood" -- as that phrase is defined in Bennett, 119 F.3d at 469-70 -- that Holladay is mentally retarded. We are faced with two contrary findings by the trial court as to whether Holladay is mentally retarded. Again, at sentencing the state trial court unambiguously found petitioner to be "slightly mentally retarded." At the Rule 20 hearing, by contrast, the court credited Dr. Dixon's opinion that he is not mentally retarded. At the end of the day, these findings are seemingly irreconcilable. Notably, neither of these findings were made in the context of an Eighth Amendment cruel and unusual punishment claim, as that claim never was presented to the state courts. Instead, they both were the product of substantively different inquiries that featured dissimilar analytical modalities.[4]

When we couple these contrary findings with the facts that 1) petitioner scored a 65 on his most recent IQ test (taken in 1991); 2) the trial court instructed the jury to consider his mental retardation as mitigating evidence at the penalty phase of his trial; and 3) the prosecution noted petitioner's mental retardation during its closing argument, we simply cannot say, for purposes of granting leave to file a second

---

[4]Indeed, whereas the question under the Sixth Amendment was whether Strickland's "objective unreasonableness" and prejudice requirements were met, the Eighth Amendment inquiry is far narrower: Is petitioner mentally retarded? If so, his execution is constitutionally barred.

habeas petition, that there is no reasonable likelihood that Holladay is mentally retarded, and that his execution consequently would not run afoul of the Eighth Amendment. Overarching this square factual conflict, we cannot avoid the observation that petitioner's Eighth Amendment claim never has been adjudicated by any court. Importantly, we do not say that Holladay is mentally retarded. Rather, we simply hold today that based on the facts presented and the procedural posture of this case petitioner should be permitted to file a second petition for a writ of habeas corpus on the basis of his Atkins claim.[5] See generally Bennett, 119 F.3d at 469.

For much the same reason, we grant petitioner's motion for a stay of execution. We consider four factors in determining whether a stay of execution is appropriate under 28 U.S.C. § 2251: "[W]hether the movant has made a showing of likelihood of success on the merits and of irreparable injury if the stay is not granted, whether the stay would substantially harm other parties, and whether granting the stay would serve the public interest." Bundy v. Wainwright, 808 F.2d 1410, 1421 (11th Cir. 1987). In this case, we already have held that there is a reasonable likelihood that Holladay is mentally retarded and that his Atkins claim consequently may succeed.

---

[5]It is not at all clear from the documents presented to us whether petitioner's claim is procedurally barred, or whether he abused the writ by waiting until now to file this petition. We expect these matters to be more fully developed and addressed in the district court, as well as any contention that petitioner has failed to exhaust his claim by first presenting it in state court.

We consider the irreparability of the injury that petitioner will suffer in the absence of a stay to be self-evident. Moreover, contrary to the State's contention that its interest in executing Holladay outweighs his interest in further proceedings, we perceive no substantial harm that will flow to the State of Alabama or its citizens from postponing petitioner's execution to determine whether that execution would violate the Eighth Amendment.

For the foregoing reasons, Holladay's application for leave to file a second or successive habeas petition is **GRANTED**, and his motion for a stay of execution is likewise **GRANTED**. The mandate shall issue forthwith.