[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————————

No. 15-10192

———————————————

D.C. Docket Number. 04-00151-cv-WLS

In re: WARREN LEE HILL, JR.,

Petitioner.

———————————————

Application for Leave to File a Second or
Successive Habeas Corpus Petition, 28 U.S.C. Section 2244(b),
by a Prisoner in State Custody

———————————————

Before:  HULL, MARCUS and MARTIN, Circuit Judges.

PER CURIAM:

The State has scheduled Warren Lee Hill, Jr.'s execution for Tuesday, January 27, 2015 at 7:00 p.m.  On January 15, 2015, and pursuant to 28 U.S.C. § 2244(b), petitioner Hill filed this second, counseled application for permission to file a second or successive federal petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the district court.  On January 16, 2015, the State filed a response opposing petitioner Hill's successive application on numerous grounds. Because over the past 20 years petitioner Hill has filed four counseled state habeas cases and three counseled federal habeas cases, we first review just some of the lengthy factual and procedural background before discussing his current application.

## I.  PROCEDURAL HISTORY

**A.    Malice Murder Conviction and Unanimous Death Sentence**

In 1990, while Hill was serving a life sentence for the murder of his girlfriend, he murdered another person in prison. Using a nail-studded board, Hill bludgeoned a fellow inmate to death in his bed. As his victim slept, "Hill removed a two-by-six board that served as a sink leg in the prison bathroom and forcefully beat the victim numerous times with the board about the head and chest as onlooking prisoners pleaded with him to stop." Head v. Hill, 277 Ga. 255, 256, 587 S.E.2d 613, 618 (Ga. 2003) ("Hill III").[1] Hill "mocked the victim as he beat him." Id.

A jury unanimously convicted Hill of malice murder and unanimously imposed a death sentence. The Georgia Supreme Court affirmed Hill's conviction and death sentence. Hill v. State, 263 Ga. 37, 37, 427 S.E.2d 770, 772 (Ga. 1993) ("Hill I"). The U.S. Supreme Court denied Hill's petition for certiorari. Hill v. Georgia, 510 U.S. 950, 114 S. Ct. 396 (1993).

## B.    No Intellectual Disability Claim at Trial or on Direct Appeal

Hill's current successive application centers on his allegation that he is intellectually disabled.[2] At the time of Hill's 1991 trial, Georgia law prohibited executing intellectually disabled defendants.[3] Yet, at his trial and on direct appeal, Hill never claimed to be intellectually disabled. Indeed, Hill's trial counsel had Hill evaluated by a clinical psychologist expert who

---

[1]We have numbered Hill's state cases in their chronological order.

[2]This order employs the terms "intellectually disabled" and "intellectual disability" because, as the Supreme Court stated in Hall v. Florida, both law and medicine have moved away from the terms "mental retardation" and "mentally retarded." 572 U.S. ___, ___, 134 S. Ct. 1986, 1990 (2014). Thus, while in the past Hill's pleadings used the term "mentally retarded," he now uses the term "intellectually disabled," and we do too in addressing his claim.

[3]In 1988, Georgia became the first state in the nation to abolish the execution of intellectually disabled persons. See O.C.G.A. § 17-7-131(c)(3), (j). The national consensus against executing the intellectually disabled that gave birth to the Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002), prohibition in 2002 was a consensus that Georgia started by enacting the very same statute—§ 17-7-131(c)(3), (j)—that petitioner Hill now claims violates Atkins and Hall. See Atkins, 536 U.S. at 313-14, 122 S. Ct. at 2248.

found Hill was not intellectually disabled.  Hill v. Humphrey, 662 F.3d 1335, 1340 (11th Cir. 2011) (en banc), cert. denied, 566 U.S. ___, 132 S. Ct. 2727 (2012).

In 1994, Hill filed his first, counseled state habeas case but did not claim he was intellectually disabled.  It was only in 1996, or five years after his 1991 trial, that Hill claimed, for the first time, he was intellectually disabled.  As explained in the procedural history below, over the course of nearly 20 years, Hill has fully litigated his intellectual disability claims in numerous proceedings in both state and federal court.  Here are just a few examples of why his claims have been repeatedly denied.

### C.    1996-2003 State Habeas Proceedings

After conducting an evidentiary hearing and after a remand by the Georgia Supreme Court, the state habeas court in 2002 determined that Hill's evidence failed to prove he was intellectually disabled beyond a reasonable doubt as required by Georgia law to bar his execution.  See O.C.G.A. § 17-7-131(c)(3), (j).  The state habeas court employed the definition of mental retardation in O.C.G.A. § 17-7-131(a)(3), which provides that "mentally retarded" means (1) having "significantly subaverage general intellectual functioning," (2) "resulting in or associated with impairments in adaptive behavior," (3) "which manifested during the developmental period."  Georgia's definition essentially tracks the clinical definitions mentioned by the Supreme Court in Atkins v. Virginia, 536 U.S. 304, 308 n.3, 122 S. Ct. 2242, 2245 n.3 (2002).  As explained later, Georgia's definition does not have Florida's strict IQ cut-off of 70 that was at issue in Hall v. Florida, 572 U.S. ___, 134 S. Ct. 1986 (2014), and that precluded defendant Hall from presenting any adaptive-behavior or other evidence as to intellectual disability.  See Hall, 572 U.S. at ___, ___, 134 S. Ct. at 1992, 1994.  In this case, however, both

3

Hill and the State presented evidence of his adaptive behavior and other evidence in various courts.

The state habeas court found Hill established the first prong of "significantly subaverage general intellectual functioning." Hill III, 277 Ga. at 255, 587 S.E.2d at 617-18. The court did not find an exact IQ score, but multiple tests had placed Hill's IQ score at between 69 and 77. In re Hill, 715 F.3d 284, 286 & n.1 (11th Cir. 2013) (collecting various IQ scores from tests administered at different times).

As to the second prong, however, the state habeas court found that Hill had not shown that he had "impairments in adaptive behavior" beyond a reasonable doubt. Hill III, 277 Ga. at 255, 587 S.E.2d at 618. Hill's case has always been about his adaptive behavior, not his IQ scores. Based on the evidence presented by Hill and the State, the state habeas court found Hill did not have impairments in "communication, self-care, home living, social/interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health, and safety." Hill, 662 F.3d at 1341; In re Hill, 715 F.3d at 286. Specifically, "[t]he court noted Hill's (1) extensive work history and 'apparent ability to function well in such employment,' (2) disciplined savings plans pursued to purchase cars and motorcycles, (3) military service, (4) active social life, (5) writing skills, and (6) ability to care for himself." In re Hill, 715 F.3d at 286. Because Hill failed to establish the second prong, the state habeas court did not discuss the third prong, which is onset before age 18.

Among the evidence before the state habeas court was Hill's military record, showing his five promotions, his successful courses in military education, instruction training and leadership management, and his excellent oral and written English language skills, as follows:

> He entered the military at the rank E–1 and, advancing each year, attained the rank of E–5 in five years. Hill was decorated as a .38 caliber sharpshooter. He

4

received military education in nuclear weapons loading, aviation fund school, and corrosion control. He completed an 80–hour instructor training course. Hill also attended and completed a 2–week military course in leadership management education and training. He was qualified as an assistant supervisor and ordnance systems maintenance man and troubleshooter, with collateral duties in shop training, as a publications petty officer, as a nuclear conventional weapons load team member, and as a corrosion control/reclamation and salvage team member. Hill was qualified as a weapons technician and was a Human Relations council member. He completed a 2–week tour with a hometown recruiting program, played on the football team, and was Petty Officer of the Watch. Hill also functioned as an assistant work center supervisor, an ordnance troubleshooter, was CPR qualified, and played on an intramural basketball team.

Evaluations of Hill during his military duty contain these descriptions of him:

Dedicated and reliable petty officer. Completes all tasks expeditiously, at times under very adverse conditions. Quiet, friendly manner, and positive attitude greatly enhances squadron morale. Uniforms and appearance always outstanding. Actively supports the Navy's equal opportunity goals. Good use of the English language orally and written. Strongly recommended for advancement and retention.

Similarly, Hill was reported to be:

[a] reliable individual and devoted second class petty officer. Works exceptionally well with others and assists in the training of weapons-loading team members. Implemented a new W/C tool control program and aided in the redesigning of the W/C technical Pubs library, both areas receiving an outstanding during the latest COMHEL WINGGRES visit. His quiet personality enhances squadron morale. Uniforms and appearance continually outstanding. Actively supports the Navy's equal opportunity goals. Demonstrates excellent command of the English language orally and written. Strongly recommended for advancement and retention in the Naval service.

In re Hill, 715 F.3d at 286-87 (footnote omitted). Hill was eligible for an E–6 promotion in the military; however, he was demoted not because of any mental inability, but because he murdered his girlfriend. Id. at 286 n.4.

5

These are just some examples of the plethora of evidence before the state habeas court and the Georgia Supreme Court. Ultimately, the state habeas court and then the Georgia Supreme Court in 2003 concluded that Hill had not shown the required impairments in adaptive behavior and thus had not established his intellectual disability beyond a reasonable doubt as required by Georgia law. Hill III, 277 Ga. at 260-63, 587 S.E.2d at 620-23. The Georgia Supreme Court also concluded in 2003 that Georgia's beyond-a-reasonable-doubt standard was not unconstitutional under Atkins. Hill III, 277 Ga. at 262, 587 S.E.2d at 622.

**D.      First Federal 28 U.S.C. § 2254 Petition—Filed October 5, 2004**

Hill then filed a § 2254 petition asserting that he was "mentally retarded, and his execution would violate the Eighth and Fourteenth Amendments to the United States Constitution." Under that heading, Hill raised subclaims, including arguments that Georgia's beyond-a-reasonable-doubt standard violated the Eighth and Fourteenth Amendments and Atkins. In 2007, the district court denied Hill's § 2254 petition, but issued a certificate of appealability on the question of whether the Georgia Supreme Court's decision to uphold the beyond-a-reasonable-doubt standard was contrary to clearly established federal law as announced in Atkins. Hill, 662 F.3d at 1342-43.

In 2011, this Court en banc affirmed the district court's ruling denying Hill's § 2254 petition. Hill, 662 F.3d at 1360-61. The en banc Court explained, under AEDPA,[4] "our review of a final state habeas decision is greatly circumscribed and is highly deferential to the state courts." Id. at 1343 (quotations omitted). "Under 28 U.S.C. § 2254(d)(1), as amended by AEDPA, a state prisoner cannot obtain federal habeas relief unless he can show the decision of the state court 'was contrary to, or involved an unreasonable application of, clearly established

---

[4]Antiterrorism and Effective Death Penalty Act of 1996, codified in relevant part in 28 U.S.C. § 2254.

6

Federal law . . . ." Id. (quoting 28 U.S.C. § 2254(d)(1)).  In short, "AEDPA precludes a federal court from imposing its will, invalidating that state statute as unconstitutional, and granting federal habeas relief in the absence of 'clearly established' federal law, which the United States Supreme Court admonishes is a holding of that Court." Id. at 1360.

Based on the strict limitations on our federal review enacted by AEDPA, the en banc Court concluded that there was no federal law or U.S. Supreme Court holding clearly establishing that the "reasonable doubt burden of proof for claims of mental retardation violates the Eighth Amendment." Id.  As such, the en banc Court held that Hill had failed to show that the state courts' rejection of his burden-of-proof claim involved an unreasonable application of clearly established federal law, as required under § 2254(d). Id. at 1360-61.[5]

The en banc Court emphasized that "[w]e do not hold, as one dissent charges, 'that states have complete discretion to choose any procedures to govern the determination of mental retardation'" and that "[w]e decide only the issue before us, which concerns only the standard of proof, and we hold only that the Georgia Supreme Court's decision in Hill III [holding the burden-of-proof statute was not unconstitutional] was not contrary to, and did not involve an unreasonable application of, Atkins." Hill, 662 F.3d at 1352 n.19.  The en banc Court never said states have limitless authority or unfettered discretion to choose procedural rules.  Rather, the en banc Court narrowly held only that Hill had not shown the Georgia Supreme Court decision was contrary to or an unreasonable application of clearly established federal law at the time of Hill's case. Id. at 1347-61.

---

[5]While petitioner Hill focuses on solely the reasonable doubt standard in isolation, the en banc Court reviewed in great detail the many procedural protections afforded under Georgia's statute and processes for a defendant asserting an intellectual disability claim. Hill, 662 F.3d at 1352-53.

Petitioner Hill petitioned for a writ of certiorari on the alleged unconstitutionality of Georgia's burden of proof as to intellectual disability claims, relying on the Eighth Amendment and Atkins. The U.S. Supreme Court thereafter denied his petition for writ of certiorari in June 2012. Hill v. Humphrey, 566 U.S. ___, 132 S. Ct. 2727 (2012).

**E.    Second State Habeas Petition—Filed July 18, 2012**

On July 18, 2012, the day of his first scheduled execution, Hill filed a second state habeas corpus petition, reasserting the same claim of intellectual disability and the same claim that Georgia's burden-of-proof standard is unconstitutional. See In re Hill, 715 F.3d at 288. The state habeas court denied the claim, as did the Georgia Supreme Court on the ground that the claim was barred by res judicata. Id. The U.S. Supreme Court denied certiorari. Hill v. Humphrey, 568 U.S. ___, 133 S. Ct. 1324 (2013).

**F.    Third State Habeas Petition—Filed February 15, 2013**

Hill filed his third state habeas petition on February 15, 2013, four days before his rescheduled execution date on February 19, 2013. In re Hill, 715 F.3d at 288. This time, Hill asserted that certain mental health experts (who had initially evaluated him in 2000) had now altered in 2013 (13 years later) their prior 2000 conclusions about his mental capabilities (even though none of the experts had seen Hill since their 2000 evaluations). Id. at 288-89 (outlining the chronological history regarding these experts). On February 18, 2013, the state habeas court denied Hill's petition, finding that it was procedurally barred because it raised a claim that already had been asserted twice before. Id. at 289. The state court also concluded that Hill's "new evidence" did not establish a miscarriage of justice that would allow him to overcome the procedural bar. Id. The Georgia Supreme Court denied Hill's application for a certificate of

8

probable cause.  Id.  The U.S. Supreme Court denied certiorari.  Hill v. Humphrey, 571 U.S. ___,
134 S. Ct. 115 (2013).

**G.    First Application to File Successive § 2254 Petition—Filed February 19, 2013**

On February 19, 2013, just three hours before his third rescheduled execution, Hill filed
in this Court his first application to file a second or successive § 2254 petition.  In re Hill, 715
F.3d at 288.  Hill argued that certain mental health experts' 2013 recanting of their 2000
assessments was new evidence establishing that he was intellectually disabled and his execution
would violate the Eighth Amendment and Atkins.  See id. at 289-90, 292.  This Court denied
Hill's application, stating first that § 2244(b)(1) barred him from raising his proposed claim
because he already had raised it in his original § 2254 petition in 2004.  Id. at 291.

Alternatively, this Court determined that Hill had failed to make a prima facie showing
under § 2244(b)(2)(B) because his new evidence related to his innocence of the death penalty
instead of his innocence "of the underlying offense."  Id. at 295-97, 299.  Lastly, this Court
concluded that the pre-AEDPA "actual innocence of sentence" exception to filing a successive
habeas petition from Sawyer v. Whitley, 505 U.S. 333, 112 S. Ct. 2514 (1992), did not survive
the AEDPA.  In re Hill, 715 F.3d at 299-301.  Accordingly, because no grounds existed to allow
Hill to file a second or successive § 2254 petition, this Court denied his application.  Id. at 301.

**H.    Original Proceeding in the U.S. Supreme Court—Filed May 22, 2013**

In May 2013, Hill filed an original petition for a writ of habeas corpus in the Supreme
Court.  In his petition, Hill cites Sawyer v. Whitley multiple times, claiming the Supreme Court
should not allow AEDPA's restrictions in § 2244(b)(2) to bar a successive petition and habeas
relief but should accept the original petition and grant habeas relief, among other reasons, based
on the miscarriage-of-justice principle in Sawyer and Felker v. Turpin, 518 U.S. 651, 116 S. Ct.

9

2333 (1996). Hill also argued as his underlying claim that Georgia's burden of proof was unconstitutional under Atkins.

The U.S. Supreme Court denied Hill's original habeas petition in October 2013. In re Hill, 571 U.S. ___, 134 S. Ct. 118 (2013).

## I.    Supreme Court's Decision in Hall v. Florida—Issued May 27, 2014

On May 27, 2014, in Hall v. Florida, the Supreme Court held that a State cannot execute a person whose IQ test score falls within the test's margin of error unless he has been able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits. 572 U.S. at ___, 134 S. Ct. at 2001. The Florida Supreme Court interpreted Fla. Stat. § 921.137 to provide that a prisoner sentenced to death was required to show an IQ test score of 70 or below before presenting any additional evidence of his intellectual disability. See Hall v. State, 109 So.3d 704, 707-08 (Fla. 2012); Cherry v. State, 959 So.2d 702, 712-13 (Fla. 2007). But Florida's strict IQ score cut-off of 70 failed to take into account the standard error of the test. In Hall, the Supreme Court struck down Florida's strict cut-off of 70 as violating the Eighth Amendment's prohibition on cruel and unusual punishment on the ground that the rule "misuse[d] IQ score on its own terms" in a way that risked the execution of those with intellectual disabilities. 572 U.S. at ___, 134 S. Ct. at 2001.

Specifically, the Supreme Court in Hall noted evidence of accepted medical practice that (1) an IQ test result, without reference to other evidence, was not conclusive evidence of intellectual capacity; and (2) each IQ test had a standard error of measurement, such that a score of 71 generally is considered to demonstrate, with 95 percent confidence, that the test-taker's IQ was between 66 and 76. Id. at ___, 134 S. Ct. at 1995-96.

## J.    Fourth State Habeas Petition Based on Hall—Filed August 29, 2014

10

After the Supreme Court's decision in Hall, petitioner Hill returned to the Georgia state courts. Hill filed his fourth state petition for habeas corpus. In his fourth state petition, Hill again argued that Georgia's beyond-a-reasonable-doubt standard was unconstitutional but this time Hill based his claims on both Hall and Atkins. The state habeas court dismissed his fourth petition as procedurally barred. On January 20, 2015, the Georgia Supreme Court denied a certificate of probable cause and also denied a stay of execution.

## II. DISCUSSION

In the instant federal successive application, petitioner Hill seeks to raise a claim in a successive § 2254 petition that he is innocent of the death penalty and ineligible for execution because of the Supreme Court's decision in Hall v. Florida. For starters, Georgia's statute is nothing like the Florida statute in Hall v. Florida, and Hill's case is nothing like Hall's. Rather, the Georgia statute fully allowed adaptive-behavior evidence, and Hill had an evidentiary hearing and presented adaptive-behavior evidence in state courts, as did the State.

In any event, to obtain permission to file a successive § 2254 petition, Hill must meet the requirements of 28 U.S.C. § 2244(b). We outline those requirements.

### A.    Requirements of 28 U.S.C. § 2244(b)

Section 2244(b)(1) of Title 28 provides that "[a] claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed." 28 U.S.C. § 2244(b)(1). Accordingly, in ruling on an application to file a successive petition, we must make a threshold determination of whether the claim to be presented in the second or successive petition was presented in the first petition. In re Hill, 715 F.3d at 291.

11

Further, even where a claim was not presented in a prior federal petition, the claim must satisfy the requirements of 28 U.S.C. § 2244(b)(2). Under that provision, we may grant the district court authorization to consider a second or successive habeas petition only if:

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2). "The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection." Id. § 2244(b)(3)(C).

For the reasons explained below, we must conclude that Hill has failed to meet the requirements of § 2244(b) with his proposed intellectual disability claim based on Hall v. Florida.

**B.    Hill's Intellectual Disability Claim is Not a "New" Claim for § 2244(b) Purposes**

As a threshold matter, petitioner Hill is barred from raising his proposed intellectual disability claim by § 2244(b)(1). In his first § 2254 petition back in 2004, Hill raised his intellectual disability claim based on the Eighth Amendment. In re Hill, 715 F.3d at 287. In support of this argument, Hill's prior § 2254 petition raised numerous sub-claims, one of which specifically asserted that Georgia's beyond-a-reasonable-doubt standard was contrary to the Supreme Court's ruling in Atkins. Thus, the "the basic thrust or gravamen of [Hill's] legal argument" in his original § 2254 petition was that his death-penalty sentence violated the Eighth

12

and Fourteenth Amendments as set forth in Atkins.  See id. at 294 (quotation omitted).  Hill's first federal habeas petition qualifies as a "prior application" for the purposes of § 2244(b)(1).  Id. at 291.

Further, in the instant application, petitioner Hill again argues that his execution would violate the Eighth and Fourteenth Amendments, and the only difference from his previously asserted claim is that he is now relying on the Supreme Court's subsequent decision in Hall to support his challenge to Georgia's burden of proof.  Accordingly, Hill's purportedly new claim is the same claim that he raised in his original § 2254 petition, albeit supported by a new legal argument.  See id. at 292.  As we noted in In re Hill, "new legal arguments in support of a prior claim are insufficient to create a new claim and avoid § 2244(b)(1)'s bar on successive petitions."  Id. at 293.  Hill cannot convert his previously asserted claim into a new claim merely by coming forward with new legal arguments.  Id. at 292.  Again, Hill's core claim has remained exactly the same since his first state habeas petition—his execution would violate the Eighth and Fourteenth Amendments, as guaranteed in Atkins.  Id. at 285, 287-89, 291-92, 294.  Therefore, Hill's current proposed claim is barred by § 2244(b)(1).  See 28 U.S.C. § 2244(b)(1).

### C.    Hall v. Florida Is Not Retroactive

Even assuming that petitioner Hill's proposed claim were not barred by § 2244(b)(1), our binding panel precedent, In re Henry, forecloses his argument that Hall applies retroactively on collateral review and entitles him to file a second or successive habeas petition.  In re Henry, 757 F.3d 1151 (11th Cir. 2014).

In In re Henry, the petitioner filed a successive application based on the proposed claim that, under Hall, his execution would violate the Constitution because he allegedly was

13

intellectual disabled. Id. at 1153-54. This Court held, as an initial matter, that Hall did announce a new rule of law within the meaning of § 2244(b)(2)(A). Id. at 1158-59.

This Court further held, however, that "the Supreme Court has not made the new rule announced in Hall retroactive to cases on collateral review." Id. at 1159. This Court first reasoned that the Supreme Court had not explicitly made Hall retroactively applicable to cases on collateral review. Id. We further noted that "[t]he Supreme Court has never held that a rule requiring procedural protections for prisoners with IQ scores within the test's standard of error would be retroactive," id. at 1161, and thus that no combination of "'multiple holdings . . . logically dictate[s] the retroactivity of the new rule.'" Id. at 1159-60 (quoting Tyler v. Cain, 533 U.S. 656, 668, 121 S. Ct. 2478, 2485 (2001) (O'Connor, J., concurring)). We also observed that the principle announced in Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934 (1989)—"that any rule placing a class of individuals beyond the state's power to execute is retroactive"—did not make Hall retroactive because "Hall merely provides new procedures for ensuring that States do not execute members of an already protected group." In re Henry, 757 F.3d at 1161. Thus, this Court concluded that a claim based on Hall v. Florida "cannot meet the requirements set by Congress [in § 2244(b)(2)(A)]." Id. at 1159.

This panel is bound by In re Henry, and therefore, we must reject petitioner Hill's attempt to rely on Hall v. Florida to bring a claim in second or successive habeas petition based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2244(b)(2)(A).

We similarly reject petitioner Hill's argument that we should not give binding precedential effect to a prior panel decision in the context of applications to file second or successive habeas petitions. This Court recently held, in In re Lambrix, that "a prior panel's

14

holding in a published three-judge order issued under § 2244(b) 'is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc.'" ___ F.3d ___, ___, 2015 WL 167685 at \*4 (11th Cir. Jan. 14, 2015) (quoting United States v. Archer, 531 F.3d 1347, 1352 (11th Cir. 2008)).  Thus, under In re Lambrix, this panel is bound by In re Henry's holding that "the Supreme Court has not made the new rule announced in Hall retroactive to cases on collateral review."  In re Henry, 757 F.3d at 1159.  Accordingly, Hill's proposed intellectual disability claim based on Hall v. Florida cannot meet the requirements of § 2244(b)(2)(A).

**D.    Even If Hall v. Florida Were Retroactive, Hall v. Florida Is Materially Different from this Case**

Even assuming that the new rule announced in Hall is somehow made retroactive on collateral review, this Court alternatively must deny petitioner Hill's application on the ground that Hall and its consideration of Florida's strict IQ cut-off of 70 (that barred presenting any other evidence) are materially different from the issue in this case concerning Georgia's beyond-a-reasonable-doubt standard for capital intellectual disability claims.

Hall involved the very specific facts of Florida's interpretation of its definition of intellectual disability.  The U.S. Supreme Court in Hall explicitly stated that Florida's "strict IQ test score cutoff of 70 is the issue," and that in Florida, "[i]f, from test scores, a prisoner is deemed to have an IQ above 70, all further exploration of intellectual disability is foreclosed."  Hall, 572 U.S. ___, ___, 134 S. Ct at 1990, 1994.  Hall was about a strict IQ of 70 cut-off for the substantive definition of intellectual disability.  In contrast, in this case, Georgia's definition of intellectual disability is consistent with both Atkins and Hall.  This case is not about Georgia's definition of intellectual disability but about the trial procedure of burden of proof.

15

Put simply, Hill cannot make a prima facie showing, pursuant to § 2244(b)(3)(C), that his application based on Hall satisfies the requirements of § 2244(b), which requires "a sufficient showing of possible merit to warrant a fuller exploration by the district court." In re Holladay, 331 F.3d 1169, 1173 (11th Cir. 2003) (quotation omitted).

Furthermore, the new rule announced in Hall—that a State cannot execute a person whose IQ test score falls within the test's margin of error unless he has been able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits—simply has no bearing on Hill's claim in this case. As noted above, Georgia's test for intellectual disability does not use a strict IQ-cutoff as the one in Hall did. Rather, Georgia law allows the consideration of evidence regarding impairments in adaptive functioning. See O.C.G.A. § 17-7-131(c)(3); Hill, 662 F.3d at 1353. Hill presented IQ, adaptive-behavior, and other evidence. Hall thus does not help Hill even if Hall were retroactive.

Nor, more importantly, can Hall be applied broadly to undermine Georgia's reasonable doubt standard for intellectual disability claims. Hill argues that Georgia's reasonable doubt standard offends Hall because the reasonable doubt standard denies defendants like Hill a fair opportunity to show that the Constitution prohibits their execution. Contrary to Hill's argument, while Hall concerned a state law that had a strict IQ of 70 cut-off that prevented a capital defendant from presenting evidence of his intellectual disability, Hall, 572 U.S. at ___, 134 S. Ct. at 2001, Georgia's reasonable doubt standard has not in any way prevented Hill from presenting adaptive-behavior evidence, or any other evidence, to support his claim of intellectual disability. Hill presented such evidence at multiple times, as did the State. As this Court noted previously, "[i]t is undisputed that Georgia's statutory definition of mental retardation is consistent with the clinical definitions cited in Atkins. . . . [T]his is not a case about the categorical exclusion of the

16

mildly mentally retarded or any other group from the <u>Atkins</u> prohibition.  Instead, it is about

Georgia's <u>procedure</u> for determining who is mentally retarded . . . ."  <u>Hill</u>, 662 F.3d at 1352.

Hill further argues that the reasonable doubt standard creates an unacceptable risk of

executing a person who suffers from a disability.  But this argument is essentially identical to

one this Court has already rejected in our en banc decision in <u>Hill</u>, <u>cf.</u> <u>Hill</u>, 662 F.3d at 1354-56,

and this panel is now bound by that decision.

**E.     To the Extent that Hill Brings a Claim under § 2244(b)(2)(B), His Pure Sentencing Claim Does Not Meet the Requirements of that Provision and His <u>Sawyer</u> Argument Is Barred**

In the present application, petitioner Hill repeatedly contends that he is "actually innocent

of the death penalty" because of his intellectual disability, and that <u>Sawyer</u>, 505 U.S. 333, 112 S.

Ct. 2514, provides such an equitable exception to the restriction on second or successive § 2254

petitions.  As an initial matter, to the extent that Hill is proposing a claim under § 2244(b)(2)(B),

even assuming that he had newly discovered evidence of his intellectual disability, his claim of

actual innocence of his death sentence is not a showing that "no reasonable factfinder would

have found [him] guilty of the <u>underlying offense</u>."  28 U.S.C. § 2244(b)(2)(B)(ii) (emphasis

added).  Indeed, Hill's attempt to raise such a claim is foreclosed both by the law-of-the-case

doctrine and the prior-panel-precedent rule, as we held in <u>In re Hill</u> that "federal law does not

authorize the filing of a successive application under § 2244(b)(2)(B) based on a sentencing

claim even in death cases."  <u>In re Hill</u>, 715 F.3d at 297.

Moreover, Hill's argument that <u>Sawyer</u> provides an equitable exception to the restriction

on successive § 2254 petitions is similarly foreclosed.  This Court held in both <u>In re Hill</u> and

<u>Gilbert v. United States</u>, 640 F.3d 1293 (11th Cir. 2011) (en banc), that the <u>Sawyer</u> actual-

innocence-of-the-death-penalty exception did not survive the AEDPA.  <u>In re Hill</u>, 715 F.3d at

17

299-301; Gilbert, 640 F.3d at 1322. Thus, Hill's attempt to rely on Sawyer to avoid complying with § 2244(b)'s statutory requirements is foreclosed both by the law of the case and prior panel precedent. Lambrix, 2015 WL 167685 at *3-4.

## F.    Request to Certify

We recognize that, on the eve of his fourth rescheduled execution, petitioner Hill has filed a request that this Court now certify several issues to the U.S. Supreme Court under 28 U.S.C. § 1254(2). The AEDPA states that "[t]he grant or denial of an authorization by a court of appeals to file a second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari." 28 U.S.C. § 2244(b)(3)(E). We need not decide whether the § 1254(2) certification avenue may be available because, in any event, we decline to certify for several reasons.

The Supreme Court has discouraged the use of this certification procedure and has accepted certified questions only four times in the last 60 years. See Iran Nat'l Airlines Corp. v. Marschalk Co., 453 U.S. 919, 101 S. Ct. 3154 (1981); Moody v. Albemarle Paper Co., 417 U.S. 622, 94 S. Ct. 2513 (1974); United States v. Barnett, 376 U.S. 681, 84 S. Ct. 984 (1964); United States v. Rice, 327 U.S. 742, 66 S. Ct. 835 (1946). The Supreme Court has admonished that the certification procedure is proper only in "rare instances." See Wisniewski v. United States, 353 U.S. 901, 902, 77 S. Ct. 633, 634 (1957). We have located no court of appeals that has ever certified a question arising from proceedings on an application to file a successive § 2254 petition.

Additionally, Hill's questions, which he wishes the Supreme Court to resolve because he disagrees with this Court's prior panel decisions, would be inappropriate questions for certification. Further, as explained above, even if Hall were retroactively applied, it would not

18

help Hill because <u>Hall</u> involved the substantive definition of intellectual disability and did not involve the burden of proof.  We disagree with the dissent's description of <u>Hall</u> as "a paradigm shift" and a "revolutionary thing."  <u>Infra</u>, at 21, 26-28 (Dissenting opinion of Martin, J.).  As outlined above, <u>Hall</u> narrowly invalidated Florida's strict IQ cut-off of 70 that, as applied in Hall's case, wholly precluded defendant Hall from presenting adaptive-behavior and any other evidence.  There is nothing paradigmatic or revolutionary about <u>Hall</u>.

In the face of multiple and insurmountable procedural hurdles erected by AEDPA—including that the instant habeas claim is exactly the same as the one we have already rejected, that <u>Hall v. Florida</u> has not been made retroactive to cases on collateral review by the Supreme Court, that even if Hall were retroactive, it could not help this petitioner, and finally that there has been no showing that Hill is not guilty of the "underlying offense"—we decline to certify.[6]

### III.  CONCLUSION

Accordingly, on the eve of Hill's fourth rescheduled execution, and for all of these reasons, and pursuant to § 2244(b), we DENY Hill's January 15, 2015 application for leave to file a successive § 2254 petition for writ of habeas corpus and DENY Hill's request to certify questions to the U.S. Supreme Court.

---

[6]In addition, in many of Georgia's post-<u>Atkins</u> death penalty cases, the U.S. Supreme Court denied capital defendants' <u>certiorari</u> petitions that made the same constitutional reasonable doubt challenge that Hill makes here.  <u>See</u> <u>Hill</u>, 662 F.3d at 1348 n.14 (collecting some of the Georgia cases, including direct appeals).  Thus, another avenue (<u>certiorari</u> petition on direct appeal) exists to present the constitutional issue here in a way that is not constrained by AEDPA deference in first § 2254 petitions (the requirement of clearly established federal law as shown by a U.S. Supreme Court holding) and the other procedural bars applicable to applications for successive § 2254 petitions, such as this one.

19

MARTIN, Circuit Judge, dissenting:

Warren Hill continues to look for a way to challenge Georgia's unique rule which puts the burden on a death row inmate to prove his own intellectual disability beyond a reasonable doubt. He now seeks to file a second or successive habeas corpus petition in federal court, arguing that this Georgia standard unconstitutionally denied him "a fair opportunity to show that the Constitution prohibits [his] execution" based on his intellectual disability. Hall v. Florida, 572 U.S. ___, ___, 134 S. Ct. 1986, 2001 (2014).

As the majority explains, the precedent in the Eleventh Circuit erects formidable barriers to his efforts. I have, in the past, expressed disagreement with some of our precedent which impedes him. See, e.g., In re Henry, 757 F.3d 1151, 1168–69 (11th Cir. 2014) (Martin, J., dissenting) (disagreeing with the majority's conclusion that Hall is not retroactive); Hill v Humphrey, 662 F.3d 1335, 1381–86 (11th Cir. 2011) (en banc) (Martin, J., dissenting) (concluding, among other things, that "Georgia's requirement that a capital defendant prove his [intellectual disability] beyond a reasonable doubt would seem inevitably to enhance the risk of unwarranted imposition of the death sentence upon those who are [intellectually disabled]" (quotation marks omitted)); id. at 1365–78 (Barkett, J., dissenting, joined by Marcus and Martin, JJ.); id. at 1378–81 (Wilson, J., dissenting, joined by Martin, J.). I also fully agree with the dissenting opinion written by Judge Barkett when she earlier served as a member of the panel for Mr. Hill's case. In re Hill, 715 F.3d 284, 302 (11th Cir. 2013) (Barkett, J., dissenting) ("When Hill has proffered uncontroverted evidence of his [intellectual disability], I cannot agree that we have no choice but to execute him anyway because his claim does not fit neatly into the narrow procedural confines delimited by AEDPA." (quotation omitted)). My views are not shared by

20

the majority of judges on this Court, however, and I am bound by this Court's rulings to the contrary.

I also recognize that the process by which Mr. Hill asks this court to certify a question to the United States Supreme Court is not encouraged by the Supreme Court and is hardly ever used. But because Mr. Hill's case presents such important questions, and because the answers the Eleventh Circuit has given to these questions are not otherwise subject to review under 28 U.S.C. § 2244, I would certify two questions to the Supreme Court. Specifically, I would certify these questions: (1) whether the miscarriage of justice exception described in Sawyer v. Whitley, 505 U.S. 333, 112 S. Ct. 2514 (1992),[1] survived the enactment of AEDPA and therefore allows Mr. Hill to bring his claim that he is actually innocent of the death penalty in a successive habeas petition; and (2) whether Hall applies retroactively to cases on collateral review. The first section of this opinion explains why certification of these two issues is proper.

In the second section, I address the Supreme Court's recent decision in Hall and why it represents a paradigm shift that undermines prior state and federal opinions about Mr. Hill's intellectual-disability claim. I read Hall to support the conclusion that Georgia's requirement that death-row inmates prove they are intellectually disabled beyond a reasonable doubt is unconstitutional because it "creates an unacceptable risk that persons with intellectual disability will be executed." Hall, 572 U.S. at ___, 134 S. Ct. at 1990.

I.

---

[1] In Sawyer, a case decided before AEDPA became law, the Supreme Court considered "the standard for determining whether a petitioner bringing a successive, abusive, or defaulted federal habeas claim has shown he is 'actually innocent' of the death penalty to which he has been sentenced so that the [federal habeas] court may reach the merits of the claim." 505 U.S. at 335, 112 S. Ct. at 2517. The Court held "to show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." Id. at 336, 112 S. Ct. at 2517.

21

Under AEDPA, our denial of Mr. Hill's application to file a second or successive habeas petition cannot be appealed. 28 U.S.C. § 2244(b)(3)(E). That means the only method available to Mr. Hill to seek Supreme Court review of our order denying him relief is by way of certification under 28 U.S.C. § 1254(2). That statute provides:

Cases in the courts of appeals may be reviewed by the Supreme Court by the following methods:

(1) By writ of certiorari granted upon the petition of any party to any civil or criminal case, before or after rendition of judgment or decree;

(2) By certification at any time by a court of appeals of any question of law in any civil or criminal case as to which instructions are desired, and upon such certification the Supreme Court may give binding instructions or require the entire record to be sent up for decision of the entire matter in controversy.

28 U.S.C. § 1254.

I am well aware that the Supreme Court has discouraged use of this certification procedure. The Court has instructed us that the certification procedure is proper only in "rare instances." See Wisniewski v. United States, 353 U.S. 901, 902, 77 S. Ct. 633, 634 (1957). Indeed, I am aware of only four cases in which the Supreme Court has accepted certified questions from Courts of Appeals in the last sixty years. See Iran Nat'l Airlines Corp. v. Marschalk Co., 453 U.S. 919, 101 S. Ct. 3154 (1981); Moody v. Albemarle Paper Co., 417 U.S. 622, 94 S. Ct. 2513 (1974); United States v. Barnett, 376 U.S. 681, 84 S. Ct. 984 (1964); United States v. Rice, 327 U.S. 742, 66 S. Ct. 835 (1946).

However, I believe the two issues I mentioned are of exceptional importance, well beyond mere "internal difficulties" of this Circuit, Wisniewski, 353 U.S. at 902, and we need Supreme Court guidance. First, the Courts of Appeals are now divided on the question of whether Sawyer's holding that an inmate can be innocent of the death penalty survived

22

AEDPA's gatekeeping provisions.  Compare In re Hill, 715 F.3d at 301 (holding that post-AEDPA, "there is no Sawyer exception to the bar on second or successive habeas corpus petitions for claims asserting 'actual innocence of the death penalty'"), and Hope v. United States, 108 F.3d 119, 120 (7th Cir. 1997) (holding that the Sawyer exception did not survive AEDPA), with Thompson v. Calderon, 151 F.3d 918, 924 & n.4 (9th Cir. 1998) (holding that the Sawyer exception survived AEDPA); see also LaFevers v. Gibson, 238 F.3d 1263, 1267 (10th Cir. 2001) (noting "there is a split among the . . . circuits that have addressed the question," but not resolving the "difficult question because even assuming § 2244(b)(2)(B)(ii) does encompass challenges to a death sentence," the petitioner's claim would fail).  I understand the Supreme Court itself to have indicated, in the context of reviewing an appeals court's recall of its mandate, that Sawyer's "miscarriage of justice standard is altogether consistent . . . with AEDPA's central concern that the merits of concluded criminal proceedings not be revisited in the absence of a strong showing of actual innocence."  Calderon v. Thompson, 523 U.S. 538, 558, 118 S. Ct. 1489, 1502 (1998).

Certification of this question would give the Supreme Court a way to bring consistency to an area of the law which otherwise evades its review.[2]  Indeed, in Felker v. Turpin, 518 U.S. 651, 116 S. Ct. 2333 (1996), Justice Souter, joined by Justices Stevens and Breyer, wrote a concurring opinion observing that although AEDPA precluded certiorari review over a Court of Appeals' "'gatekeeper' determination," the "statute's text does not necessarily foreclose all of [the Supreme Court's] appellate jurisdiction" given the statutory authority to certify questions

---

[2] I recognize that the Supreme Court could have also granted Mr. Hill's petition for writ of certiorari from the state court's denial of his successive state habeas corpus petition.  However, the issue of whether Sawyer's equitable exception survived AEDPA's gatekeeping provisions cannot travel to the Court by that route.  By definition, AEDPA's restrictions on second and successive habeas corpus applications apply only to federal courts.

23

under § 1254(2).  Id. at 666–67, 116 S. Ct. at 2341 (Souter, J., concurring).  Justice Souter added, "if it should later turn out that statutory avenues other than certiorari for reviewing a gatekeeping determination were closed, the question whether the statute exceeded Congress's Exceptions Clause power would be open.  The question could arise if the courts of appeals adopted divergent interpretations of the gatekeeper standard."  Id. at 667, 116 S. Ct. at 2342 (footnote omitted).  It has now come to pass that the Courts of Appeals have adopted divergent interpretations of the AEDPA's gatekeeper standard on the question of Sawyer's actual innocence of the death penalty exception.

Second, only the Supreme Court can decide the question of whether Hall applies retroactively to cases on collateral review.  See Tyler v. Cain, 533 U.S. 656, 662, 121 S. Ct. 2478, 2482 (2001) (holding that § 2244(b)(2)(A)'s retroactivity requirement "is satisfied only if [the Supreme Court] has held that the new rule is retroactively applicable to cases on collateral review").  If there had been no other contrary legal developments since we decided In re Henry, I would not think certification of this retroactivity question appropriate.  But there has been a significant development that I cannot ignore.  In October 2014, the Supreme Court granted a writ of certiorari to a successive capital habeas petitioner, vacated the Florida Supreme Court's judgment, and remanded for further consideration in light of Hall.  See Haliburton v. Florida, ___ U.S. ___, 135 S. Ct. 178 (2014).   I can think of no reason for the Supreme Court to remand a case like Haliburton, arising as it did in the context of a successive habeas application, unless it intended for Hall to apply retroactively.  The Supreme Court does not "create new constitutional rules of criminal procedure unless those rules would be applied retroactively to all defendants on collateral review through one of . . . two exceptions."  Teague v. Lane, 489 U.S. 288, 316, 301 S.

24

Ct. 1060, 1078 (1989) (plurality opinion).  Remanding <u>Haliburton</u> in light of <u>Hall</u> signals that the

Supreme Court intended for <u>Hall</u> to apply retroactively to all cases on collateral review.

The Majority emphasizes the extensive process given to Mr. Hill by both federal and

state courts over the years.  Right they are, but Mr. Hill's case is not unique in that regard.[3]  For

example, Mr. Haliburton's conviction for a murder committed in 1981 became final for the

purposes of retroactivity analysis on June 28, 1991, when the United States Supreme Court

denied certiorari review from his direct appeal.  <u>See</u> <u>Haliburton v. State</u>, 561 So. 2d 248, 249

(Fla. 1990), <u>cert denied sub nom.</u> <u>Haliburton v. Florida</u>, 501 U.S. 1259, 111 S. Ct. 2910 (1991).

The Florida Supreme Court then affirmed the denial of state postconviction relief in 1997, <u>see</u>

<u>Haliburton v. Singletary</u>, 691 So. 2d 466 (Fla. 1997), and this Court originally affirmed the

denial of federal habeas corpus relief in 2003, <u>see</u> <u>Haliburton v. Sec'y for Dep't of Corr.</u>, 342

F.3d 1233 (11th Cir. 2003).  If the Supreme Court viewed <u>Hall</u> as sufficient to trump the interests

in finality that existed in <u>Haliburton</u>—a case that became final long before Mr. Hill's—surely the

Supreme Court's actions speak volumes about <u>Hall</u>'s retroactivity.  The Majority truly has

labored for years over Mr. Hill's case.  That is because what matters is not the extent of the

process he gets, but rather arriving at the correct answers to the difficult questions he raises.

II.

This Court has held, and the parties do not dispute, that <u>Hall</u> announced a new rule of

constitutional law.  <u>See</u> <u>In re Henry</u>, 757 F.3d at 1158 ("<u>Hall</u> did indeed announce a new rule of

constitutional law.").  It is well settled that "a case announces a new rule of constitutional law

when it breaks new ground or imposes a new obligation on the States or the Federal

government."  <u>Id.</u> (quoting <u>Teague</u>, 489 U.S. at 301, 109 S. Ct. at 1070).  As <u>In re Henry</u>

---

[3]   I have attached a chart to the end of my dissent comparing some of the relevant dates between Messrs. Hill, Haliburton, and Hall.

explained: "For the first time in Hall, the Supreme Court imposed a new obligation on the states not dictated by Atkins [v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002)] because Hall restricted the states' previously recognized power to set procedures governing the execution of the intellectually disabled." 757 F.3d at 1158–59.

I read Hall as a paradigm shift in the basic assumptions about how much discretion states have to define intellectual disability and to craft procedures to enforce the Eighth and Fourteenth Amendments' prohibition against executing people who are intellectually disabled.[4]  In 2002, Atkins left to individual states "the task of developing appropriate ways to enforce the constitutional restriction." 536 U.S. at 317, 122 S. Ct. at 2250 (quotation omitted). Seven years later, the Supreme Court reaffirmed that Atkins "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation will be so impaired as to fall within Atkins' compass." Bobby v. Bies, 556 U.S. 825, 831, 129 S. Ct. 2145, 2150 (2009) (alteration and quotation marks omitted). Indeed, when rejecting Mr. Hill's challenge to Georgia's unique beyond-a-reasonable-doubt standard of proof, both the Georgia Supreme Court and this Court relied on the language from Atkins that gave states discretion to develop "appropriate ways" to protect the constitutional right. See Hill, 662 F.3d at 1347–48 (rejecting Mr. Hill's argument that Georgia's beyond-a-reasonable-doubt standard was contrary to Atkins because Atkins "expressly left the procedures" for determining who was intellectually disabled to the states (citing Atkins, 536 U.S. at 317, 122 S. Ct. at 2250)); Head v. Hill, 587

---

[4]   The Majority disagrees with my reference to Hall as a "paradigm shift" and "revolutionary." See Majority Op. at 19. However, it was this Court's decision in In re Henry that recognized Hall was a new rule because it "imposed a new obligation on the states not dictated by Atkins" for the first time. 757 F.3d at 1158. In re Henry further explained: "Justice Kennedy's Hall opinion explained that the basis for its holding stretched beyond Atkins alone: '[T]he precedents of this Court 'give us essential instruction,' . . . but the inquiry must go further.'" 757 F.3d at 1159 (citations omitted and alterations adopted).

S.E.2d 613, 620 (Ga. 2003) ("[I]n <u>Atkins</u>, the Supreme Court of the United States made clear that it was entrusting the states with the power to develop the procedures necessary to enforce the newly recognized federal constitutional ban on the execution of the [intellectually disabled]." (citing <u>Atkins</u>, 536 U.S. at 317, 122 S. Ct. at 2250)).  In other words, the assumption that states were free to come up with "appropriate ways" to define intellectual disability was a primary and indispensable part of the state court's and this Court's rejection of Mr. Hill's challenge to Georgia's beyond-a-reasonable-doubt standard of proof.

The revolutionary thing about <u>Hall</u> is its holding that "<u>Atkins</u> did not give the States unfettered discretion to define the full scope of the constitutional protection [against executing the intellectually disabled]."  572 U.S. at ___, 134 S. Ct. at 1998.  "If the States were to have complete autonomy to define intellectual disability as they wished, the Court's decision in <u>Atkins</u> could become a nullity, and the Eighth Amendment's protection of human dignity would not become a reality."  <u>Id.</u> at ___, 134 S. Ct. at 1999.  The Court emphasized the significance of its holding in <u>Hall</u> as maintaining "our Nation's commitment to dignity and its duty to teach human decency as the mark of a civilized world."  <u>Id.</u> at ___, 134 S. Ct. at 2001.

Because <u>Hall</u> repudiated a basic assumption about <u>Atkins</u> that this Court relied on in its earlier rulings in Mr. Hill's case, I believe the law-of-the-case doctrine does not apply to Mr. Hill's current application based on two exceptions to the law-of-the-case rule.  First, <u>Hall</u> is "controlling authority [that] has since made a contrary decision of law applicable to th[e] issue." <u>Culpepper v. Irwin Mortg. Corp.</u>, 491 F.3d 1260, 1271 (11th Cir. 2007).  Second, <u>Hall</u> establishes that the approach taken by our en banc <u>Hill</u> opinion was "clearly erroneous," such that continuing to apply it "would work manifest injustice."  <u>Id.</u>  The assumption in <u>Hill</u>, 662 F.3d at 1347, that states have unfettered discretion to enforce the ban against executing the

27

intellectually disabled is a legal error that is beyond debate in light of Hall. The manifest injustice of applying the law-of-the case doctrine to Mr. Hill is obvious. Doing so would sanction the execution of a person who mental health experts unanimously agree is intellectually disabled. See Hall, 572 U.S. at ___, 134 S. Ct. at 1992 ("[T]o impose the harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being.").

And there are other aspects of Hall that demonstrate it worked a paradigm shift as to our understanding of the states' role in protecting the intellectually disabled from wrongful execution. Hall acknowledged that "[t]he States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects." Id. at ___, 134 S. Ct. at 2001. In this vein, Hall emphasized that the risk of error in how a state decides whether an inmate is intellectually disabled is critical to the analysis about whether that decision is constitutional. Hall struck down Florida's definition of intellectual disability, which "require[d] an IQ test score of 70 or less," because it was a "rigid rule" that "creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional." Id. at ___, 134 S. Ct. at 1990. In doing so, the Supreme Court stressed that one of the reasons for a categorical rule making intellectually disabled offenders ineligible for the death penalty is that such "persons face 'a special risk of wrongful execution.'" Id. at ___, 134 S. Ct. at 1993 (quoting Atkins, 536 U.S. at 320–21, 122 S. Ct. at 2252). The clear implication of Hall is that states may not employ intellectual disability definitions or procedures that "create[] an unacceptable risk that persons with intellectual disability will be executed." Id. at ___, 134 S. Ct. at 1990.

28

Notably, Hall's conclusion that Florida's rigid rule was unconstitutional was based, in part, on the "views of medical experts." Id. at ___, 134 S. Ct. at 2000. Of course "[t]hese views [did] not dictate the Court's decision, yet the Court d[id] not disregard these informed assessments." Id. (citing Kansas v. Crane, 534 U.S. 407, 413, 122 S. Ct. 867, 871 (2002) ("[T]he science of psychiatry . . . informs but does not control ultimate legal determinations . . . .")). "Courts must recognize, as does the medical community, that the IQ test is imprecise." Hall, 572 U.S. at ___, 134 S. Ct. at 2001. Hall reasoned that "[a] State that ignores the inherent imprecision of these tests risks executing a person who suffers from intellectual disability." Id. Likewise, Mr. Hill's case shows how Georgia's standard also unreasonably discounts medical determinations that are made to the highest degree of medical certainty, yet may not be beyond a reasonable doubt.

The logic and reasoning of Hall lead me to the conclusion that Georgia's singular beyond-a-reasonable-doubt standard of proof, like Florida's rigid IQ cut-off score, must not "create[] an unacceptable risk that persons with intellectual disability will be executed" in order to pass constitutional muster. Id. at ___, 134 S. Ct. at 1990. Georgia's beyond-a-reasonable-doubt standard, like Florida's IQ cut-off, is properly understood as a substantive aspect of Georgia's definition of intellectual disability. See Medronic, Inc. v. Mirowski Family Ventures, LLC, ___ U.S. ___, ___, 134 S. Ct. 843, 849 (2014) (noting "that the burden of proof is a substantive aspect of a claim" (quotation marks omitted)). That being the case, it "serves to allocate the risk of error between the litigants." Addington v. Texas, 441 U.S. 418, 423, 99 S. Ct. 1804, 1807 (1979). And the problem is that Georgia's standard "allocates almost the entire risk of error to the offender while leaving virtually none of it with the State." Hill, 662 F.3d at 1372 (Barkett, J., dissenting). In this way, it creates an unacceptable risk of wrongful execution

29

and denies offenders, like Mr. Hill, a "fair opportunity to show" they are not eligible for the death penalty based on their intellectual disability.

As this discussion reveals, my reading of Hall leads me to a very different conclusion than that of  the Majority about how it impacts Georgia's adjudication of intellectual disability claims.  Georgia's statutory definition of intellectual disability is almost identical to Florida's. Georgia's statute provides: "'Mentally retarded' means having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period."  O.C.G.A. § 17-7-131(a)(3).  Florida's statute provides, in relevant part:

> As used in this section, the term "intellectually disabled" or "intellectual disability" means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18. The term "significantly subaverage general intellectual functioning," for the purpose of this section, means performance that is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the Agency for Persons with Disabilities. The term "adaptive behavior," for the purpose of this definition, means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community.

Fla. Stat. § 921.137.  To the extent that the Georgia and Florida statutes require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before the age of eighteen, both are consistent with the "clinical definitions" of intellectual disability referred to by the Supreme Court in Atkins.  536 U.S. at 318, 122 S. Ct. at 2251; see also id. at 309 n.3, 122 S. Ct. at 2245 n.3 (citing definitions of intellectual disability from the American Association of Mental Retardation (AAMR), Mental Retardation: Definition, Classification, and Systems of Supports 5

30

(9th ed. 1992) and the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000)).[5]

There is one important difference between Georgia's and Florida's system for determining who is not eligible for execution based on intellectual disability. Under Florida's definition of intellectual disability, Mr. Hill would likely have been considered intellectually disabled, even before the Supreme Court decided Hall. Mr. Hill's state habeas corpus judge found beyond a reasonable doubt that Mr. Hill had qualifying IQ scores showing significantly subaverage general intellectual functioning. Of course that same judge also found that Mr. Hill failed to prove his adaptive skills deficits beyond a reasonable doubt, but he did find Mr. Hill showed adaptive deficits and was intellectually disabled by a preponderance of the evidence. Unlike Georgia, Florida only requires offenders to prove intellectual disability by clear and convincing evidence, not beyond a reasonable doubt. See State v. Herring, 76 So. 3d 891, 895 (Fla. 2011) ("[A] defendant must prove each of the three elements [of intellectual disability] by clear and convincing evidence."). But for Georgia's uniquely high burden for proving intellectual disability, I have no question that Mr. Hill would have been found intellectually disabled in state habeas corpus proceedings and he would not be facing his execution tomorrow. No one disputes that every mental health expert who has ever evaluated Mr. Hill, now including the state's three experts, has concluded he is intellectually disabled. The fact that there is now unanimity among these experts makes it all the more striking to recall that even before this

---

[5] The AAMR is now known as the American Association on Intellectual and Developmental Disabilities (AAIDD). Florida's current definition of intellectual disability tracks very closely the AAIDD's most recent definition of intellectual disability. Compare Fla. Stat. § 921.137(1), with AAIDD, Intellectual Disability: Definition, Classification and Systems of Supports 5 (11th ed. 2011) ("Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.").

31

unanimity existed, the state habeas court made a finding that Mr. Hill had proved, beyond a reasonable doubt, that his IQ showed he had significantly subaverage intellectual functioning. So it was only on this slender aspect of the intellectual disability determination that Mr. Hill failed to meet Georgia's beyond-a-reasonable-doubt standard.

I respectfully dissent to the denial of the certification of questions.

**APPENDIX A**

| Petitioner | Date of Offense | Date that Conviction Became Final[6] | Date that Court of Appeals Affirmed Denial of § 2254 Federal Habeas Petition | Date that U.S. Supreme Court Intervened |
|---|---|---|---|---|
| Warren Hill | Aug. 17, 1990[7] | Jan. 10, 1994[8] | Nov. 22, 2011[9] | N/A |
| Freddie Hall | Feb. 21, 1978[10] | Jan. 13, 1982[11] | Nov. 16, 1986[12] | May 27, 2014[13] |
| Jerry Haliburton | Aug. 9, 1981[14] | Jun. 21, 1991[15] | Aug. 21, 2003[16] | Oct. 6, 2014[17] |

---

[6] A case becomes final on direct appeal when the Supreme Court denies a petition for writ of certiorari or, if none is filed, when the time expires to file such a petition. See McCloud v. Hooks, 560 F.3d 1223, 1227 (11th Cir. 2009).

[7] Hill, 587 S.E. 2d at 618.

[8] Hill v. Georgia, 510 U.S. 1066, 114 S. Ct. 745 (1994).

[9] Hill, 662 F.3d at 1335.

[10] Hall v. State, 403 So. 2d 1319, 1320 (Fla. 1981).

[11] On October 15, 1981, the Florida Supreme Court denied Mr. Hall's petition for rehearing its decision affirming his conviction and death sentence. Hall, 403 So. 2d at 1319. Mr. Hall's time for filing a petition for certiorari in the United States Supreme Court expired on January 13, 1982. See U.S. Sup. Ct. R. 13(1).

[12] Hall v. Wainwright, 805 F.2d 945 (11th Cir. 1986).

[13] Hall, 572 U.S. at ___, 134 S. Ct. at 1986.

[14] Haliburton v. State, 476 So. 2d 192, 193 (Fla. 1985), cert. granted, judgment vacated sub nom. Florida v. Haliburton, 474 U.S. 1078, 106 S. Ct. 1452 (1986).

[15] Haliburton v. Florida, 501 U.S. 1259, 111 S. Ct. 2910 (1991).

[16] Haliburton v. Sec'y for Dep't of Corr., 342 F.3d at 1233.

[17] Haliburton, ___ U.S. at ___, 135 S. Ct. at 178 (granting petition, vacating judgment, and remanding in light of Hall).